No. 24-40778

# In the United States Court of Appeals for the Fifth Circuit

John Doe, Medical Doctor,
Doctor of Philosophy,

*Plaintiff-Appellant*,

v.

United States Department of Health
and Human Services,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Eastern District of Texas, Beaumont Division

## BRIEF FOR PLAINTIFF-APPELLANT JOHN DOE

Judd E. Stone II
Michael R. Abrams
Caroline A. Merideth
Cody C. Coll
**STONE HILTON PLLC**
600 Congress Ave., Suite 2350
Austin, TX 78701
(737) 465-3897

*Counsel for Plaintiff-Appellant
John Doe*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Plaintiff-Appellant:** John Doe, represented by Stone Hilton PLLC attorneys Judd E. Stone II, Michael R. Abrams, Caroline A. Merideth and Cody C. Coll.

**Defendant-Appellee:** United States Department of Health and Human Services, represented by James Gillingham of the United States Attorney's Office.

*/s/ Judd E. Stone II*
Counsel of Record for
Plaintiff-Appellant

## STATEMENT REGARDING ORAL ARGUMENT

The district court refused to accept the detailed allegations in Appellant John Doe's complaint as true. This straightforward misapplication of governing pleading standards would not ordinarily warrant oral argument. The facts underlying this case are complex, however, as is its procedural history, which concerns federal and state litigation outside this Circuit and multiple administrative proceedings before the United States Department of Health and Human Services. Oral argument will allow for a thorough discussion of this critical background context and is thus likely to aid the Court in its decisional process.

# TABLE OF CONTENTS

Certificate of Interested Persons ............................................................... i

Statement Regarding Oral Argument ....................................................... ii

Table of Contents ................................................................................... iii

Table of Authorities ............................................................................... iv

Introduction .............................................................................................1

Statement of Jurisdiction.........................................................................3

Issues Presented ......................................................................................3

Statement of the Case..............................................................................4

I.      Regulatory Framework ..................................................................4

II.     Factual Background .......................................................................7

     A.      The Hospital's false AAR ......................................................7

     B.      The Secretary's cursory review of the AAR ..........................13

III.    Procedural History ......................................................................14

     A.      Doe's New York state-court action against the Hospital ......14

     B.      Doe's District of Columbia action against the Secretary ........15

     C.      Doe's request to the Secretary for reconsideration .................16

     D.      The Eastern District of Texas action against the Secretary.....17

Summary of the Argument.....................................................................18

Standard of Review ...............................................................................19

Argument................................................................................................20

I.      The District Court Improperly Dismissed Doe's APA claim. .....20

II.     The District Court Improperly Dismissed Doe's As-Applied Due Process
        Claim..........................................................................................27

Conclusion .............................................................................................31

Certificate of Service .............................................................................32

Certificate of Compliance ......................................................................32

# TABLE OF AUTHORITIES

**Cases**

*Agrilectric Power Partners v. General Elec. Co.*,
  20 F.3d 663 (5th Cir.1994) ...................................................................30

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................26

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................20

*Budhathoki v. Nielsen*,
  898 F.3d 504 (5th Cir. 2018) ...............................................................19

*DHS v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020) ................................................................................25

*Doe v. Rodgers*,
  144 S. Ct. 328 (2023) ................................................................... 16, 30

*Doe v. Rogers*,
  139 F. Supp. 3d 120 (D.D.C. 2015) .....................................................15

*Doe v. Rogers*,
  656 F. Supp. 3d 78 (D.D.C. 2023) .......................................................16

*Doe v. Rogers*,
  No. 20-5297, 2023 WL 1978697 (D.C. Cir. Feb. 14, 2023) ................16

*Erickson v. Pardus*,
  551 U.S. 89 (2007) ..............................................................................27

*Hous. Pro. Towing Ass'n v. City of Houston*,
  812 F.3d 443 (5th Cir. 2016) ...............................................................29

*I.C.C. v. Bhd. of Locomotive Eng'rs*,
  482 U.S. 270 (1987) ..................................................................... passim

*Indep. Turtle Farmers of La., Inc. v. United States*,
  703 F. Supp. 2d 604 (W.D. La. 2010) ..................................................21

*Logan v. Zimmerman Brush Co.*,
  455 U.S. 422 (1982) ............................................................................27

*Montoya v. FedEx Ground Package Sys., Inc.*,
  614 F.3d 145 (5th Cir. 2010) .................................................................7

*Morgan v. Covington Twp.*,
    648 F.3d 172 (3rd Cir. 2011) .................................................................30

*N.Y. Life Ins. Co. v. Gillispie*,
    203 F.3d 384 (5th Cir. 2000) ................................................................30

*Palacios v. Spencer*,
    906 F.3d 124 (D.C. Cir. 2018) .............................................................21

*Sacks v. Tex. S. Univ.*,
    83 F.4th 340 (5th Cir. 2023) ........................................................ 29, 30

*Sendra Corp. v. Magaw*,
    111 F.3d 162 (D.C. Cir. 1997) .............................................................23

*Smalls v. Spencer*,
    No. CV 17-606 (TJK), 2021 WL 289382 (D.D.C. Jan. 28, 2021) ........23

*Test Masters Educ. Servs., Inc. v. Singh*,
    428 F.3d 559 (5th Cir. 2005) ........................................................ 19, 30

*Vill. of Barrington v. Surface Transp. Bd.*,
    758 F.3d 326 (D.C. Cir. 2014) .................................................. 20, 21, 25

*Wampler v. Sw. Bell Tel. Co.*,
    597 F.3d 741 (5th Cir. 2010) ................................................................19

*Wilson v. Birnberg*,
    667 F.3d 591 (5th Cir. 2012) ................................................................26

## Statutes

5 U.S.C. § 706(2)(A) ..................................................................................21

28 U.S.C. § 1291 ..........................................................................................3

28 U.S.C. § 1331 ..........................................................................................3

28 U.S.C. § 1343 .......................................................................................3, 6

42 U.S.C. § 11101 .......................................................................................4

42 U.S.C. § 11101(2)-(3) ............................................................................5

42 U.S.C. § 11133(a)(1)(B) .........................................................................5

42 U.S.C. § 11133(a)(1)(B)(i) ......................................................................5

42 U.S.C. § 11134(a) ...................................................................................4

42 U.S.C. § 11135(a)(1) ..............................................................................5

42 U.S.C. § 11136 ...................................................................5

42 U.S.C. § 11151(9) ..............................................................22

42 U.S.C. §§ 11131-33 .............................................................4

## Other Authorities

H. Rep. No. 99-903, at 15 (1986) ...........................................5

*Health Care Quality Improvement Act of 1986: Hearing on H.R. 5540 Before the H. Subcomm. on Civ. & Const. Rts. of the H. Comm. on the Judiciary*, 99th Cong. 47 (statement of Rep. Waxman) ..............................4

U.S. Dep't of Health & Human Servs., Health Resources & Servs. Admin., NPDB Guidebook (2018) ..................................................4, 7

U.S. Dep't of Health & Human Servs., Health Resources & Servs. Admin., NPDB Guidebook (2001) ..................................................7, 22

## Rules

Fed. R. Civ. P. 12(b)(6) ...........................................................19

## Regulations

45 C.F.R. pt. 60 ......................................................................5

45 C.F.R. § 60.6(a) ..................................................................5

45 C.F.R. § 60.6(b) ..................................................................5

45 C.F.R. § 60.6(d) ..................................................................5

45 C.F.R. § 60.21(b)(2) ............................................................6

45 C.F.R. § 60.21(b)(3) ............................................................6

45 C.F.R. § 60.21(c)(1) .............................................................6

45 C.F.R. § 60.21(c)(2) .............................................................6

**INTRODUCTION**

Over thirty-five years ago, the Supreme Court announced what has become a bedrock principle of administrative law: when a party unsuccessfully seeks reconsideration of an agency's decision based on new evidence or changed circumstances, he is entitled to his day in court to challenge the agency's denial of his request. *I.C.C. v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 278 (1987) ("*BLE*").

Appellant Dr. John Doe pleaded ample facts to fall within *BLE*'s ambit. His former employer, a New York-based hospital, submitted a false Adverse Action Report ("AAR") claiming that he voluntarily resigned from his employment while under investigation. Since December 2009, the Secretary of Health and Human Services has maintained that report in a database that it operates called the National Practitioner Data Bank. The AAR, which is available to hospitals and healthcare providers across the country, has carried devastating consequences; as Doe has attested, employers are exceedingly unlikely to hire anyone with such a report on their record, regardless of the circumstances surrounding the report or the report's inaccuracy.

As soon as he learned of it, Doe promptly sought administrative review of the AAR with the hope that the Secretary would remove it from the database. The Secretary deliberated for two years and denied his request in 2012. A federal district court in the District of Columbia ultimately upheld that denial. But the record that

the Secretary considered—and which in turn formed the basis of Doe's first federal suit—was woefully incomplete. In follow-on state-court litigation against the hospital, Doe learned, for example, that the hospital never contemplated corrective action against his clinical privileges. There was thus no "investigation" that should have triggered an AAR. Armed with this and other pieces of new exculpatory evidence, Doe sought reconsideration of the Secretary's initial denial. When the Secretary refused, Doe sued in the Eastern District of Texas. Relevant here, he alleged that the Secretary's denial of his reconsideration request violated the Administrative Procedure Act ("APA") and his procedural due process rights under the Fifth Amendment.

The district court wrongly dismissed both claims. It discounted the meticulous factual narrative in Doe's pleadings and instead reasoned that he should have brought forth this same evidence in his first federal suit. *BLE* makes clear, however, that the district court should have instead determined whether Doe's new evidence arose after the original *agency* proceeding. And Doe explained at length that he only uncovered this wealth of information well after the Secretary denied his request for review in 2012. That should have been enough for Doe's APA claim to proceed.

As for his due process claim, the district court held that res judicata barred review. This too was erroneous. Doe tied his due process claim to the Secretary's denial of reconsideration, which occurred following the first case's conclusion. This

claim has never been litigated in any prior judicial proceeding, nor could it have been. The district court therefore erred in applying res judicata to bar Doe's due process claim based on a different set of factual developments that no court has previously heard.

In short, Doe plausibly pleaded constitutional and statutory violations arising from the Secretary's refusal to reconsider, and his claims should have survived the Secretary's motion to dismiss. The district court's contrary judgment should be reversed.

## STATEMENT OF JURISDICTION

Doe invoked the district court's jurisdiction under 28 U.S.C. §§ 1331 and 1343. ROA.8. The district court entered final judgment on November 8, 2024, ROA.435, and Doe filed a timely notice of appeal, ROA.444. This Court has jurisdiction to review the final judgment under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.  Whether the district court erred in dismissing Doe's APA claim premised on new evidence unavailable during the Secretary's original review of the AAR.

2.  Whether the district court erred in dismissing Doe's as-applied claim that the Secretary's failure to reconsider the agency's original decision violated his procedural due process rights.

**STATEMENT OF THE CASE**

## I.    Regulatory Framework

In 1986, Congress enacted the Health Care Quality Improvement Act, 42 U.S.C. § 11101 *et seq.*, to protect the public from "the small—but deadly—group of incompetent and unprofessional physicians who cause serious injury and needless death." *Health Care Quality Improvement Act of 1986: Hearing on H.R. 5540 Before the H. Subcomm. on Civ. & Const. Rts. of the H. Comm. on the Judiciary*, 99th Cong. 47 (statement of Rep. Waxman). To achieve that goal, the Act imposes various reporting requirements on insurance companies, boards of medical examiners, and healthcare entities, with the aim of tracking and identifying practitioners who could jeopardize patient health. *See* 42 U.S.C. §§ 11131-33.

The National Practitioner Data Bank is a regulatory creation that the Department of Health and Human Services ("HHS") has promulgated under the Act. *See id.* § 11134(a). Specifically, the Act requires that "health care entities" submit reports to the Secretary, commonly referred to as Adverse Action Reports (AARs), U.S. DEP'T OF HEALTH & HUMAN SERVS., HEALTH RESOURCES & SERVS. ADMIN., NPDB GUIDEBOOK, at E-6, E-7 (2018), if they have accepted "the surrender of clinical privileges of a physician . . . while the physician is under an investigation by

the entity relating to possible incompetence or improper professional conduct,"[1] 42 U.S.C. § 11133(a)(1)(B)(i). The Secretary maintains those AARs in the Data Bank. In turn, hospitals must request the "information reported under this subchapter concerning the physician or practitioner" regarding any physician who "applies to be on the medical staff . . . of, or for clinical privileges at, the hospital." *Id.* § 11135(a)(1). The Secretary must promulgate regulations creating procedures for a physician to dispute the accuracy of a report to the Data Bank. *Id.* § 11136.

Extensive regulations govern the reporting process, maintenance of the Data Bank, and procedures for disputing AARs. 45 C.F.R. pt. 60. From the outset, reporting entities are responsible for the accuracy of their AARs, and must update and revise them when appropriate. *Id.* §§ 60.6(a), (b). A "subject" doctor has three options when he receives the AAR. *Id.* § 60.6(d). He can accept the AAR, provide a statement that "will be permanently appended to the report," or pursue a "dispute process." *Id.* In no circumstances, however, will the agency "examine the underlying merits of a reportable action." *Id.* § 60.6(a).

---

[1] Entities must also file reports when they "accept[] the surrender of clinical privileges" "in return for not conducting [] an investigation." 42 U.S.C. § 11133(a)(1)(B). The purpose of these reports is to prevent physicians and hospitals from collusively short-circuiting an investigation and a possible finding of misconduct or incompetence by agreeing to terminate or forego a potentially damning investigation in exchange for surrendering privileges. 42 U.S.C. § 11101(2)-(3); H. Rep. No. 99-903, at 15 (1986).

A physician aggrieved by an inaccurate AAR must first request that the Secretary place the report into "disputed status." *Id.* § 60.21(b). That designation is visible to all who request information from the Data Bank, and the hospital is likewise notified. *Id*. § 60.21(b)(2). A dialog between the physician and hospital then takes place. *Id.* § 60.21(b)(3). Absent a correction from the hospital within 60 days, the physician may request that the Secretary review and correct the report. *Id.* The physician must submit all "appropriate materials that support the subject's position," after which the Secretary reviews the accuracy of the facts reported. *Id.* § 60.21(c)(1). The review does not extend to the appropriateness of the hospital's disciplinary action or the due process the physician received from the hospital. *Id.* The review process ends with the Secretary determining either that (1) the report is accurate and reportable, (2) the report is inaccurate and should be corrected, (3) the issues raised are outside the scope of review, or (4) the adverse action was unreportable in the first instance and the report should be removed. *Id.* § 60.21(c)(2).

The Secretary has not promulgated regulations for a formal appeals process. Instead, the Secretary has advised that physicians "may request reconsideration of Dispute Resolution decisions" by submitting "a written request for reconsideration and documentation to support any new information to the NPDB." 2018 NPDB

GUIDEBOOK, *supra*, at F-10.[2] The request "should be specific about any new information that was unavailable to" the physician and identify any "issue(s) they believe were inappropriately considered during the" first review. *Id.* The Secretary then either affirms the previous decision or issues a revised final decision. *Id.*

## II.    Factual Background

### A.    The Hospital's false AAR

Because this case arrives on appeal from a motion to dismiss, the following facts are taken from Doe's complaint. ROA.6-187; *see Montoya v. FedEx Ground Package Sys., Inc.*, 614 F.3d 145, 146 (5th Cir. 2010).

Doe is a highly trained and skilled cardio-thoracic surgeon with a history of successful practice. ROA.8. Beginning in June 2009, he was employed as an attending physician at the Peconic Bay Medical Center (PBMC or the Hospital) with responsibility for thoracic and general surgery and as Director of PBMC's thoracic surgery program. ROA.13.

On October 2, 2009, Doe performed a laparoscopic abdominal operation on a 14-year-old girl who presented to the hospital's emergency department with a perforated retrocecal appendicitis that required immediate removal to save her life. ROA.14. Doe was assisted by the Hospital's former Surgery Chairman, Dr. Richard

---

[2] The Secretary maintained similar guidance prior to its 2018 revisions to the Data Bank handbook. *See* U.S. DEP'T OF HEALTH & HUMAN SERVS., HEALTH RESOURCES & SERVS. ADMIN., NPDB GUIDEBOOK, at F-6 (2001).

Rubenstein. ROA.14. During the operation, and with Rubenstein's concurrence, Doe transected an "inflammatory band" as necessary to access the necrotic, perforated appendix. ROA.14. Dr. Doe sent a biopsy of the transected band for pathological analysis. ROA.14-15. The pathologist's biopsy report, issued on October 5, 2009, stated that the transected band was a right Fallopian tube that had serosal adhesions and marked vascular congestion, indicating that it was heavily diseased. ROA.15.

Despite the complication, the case resolved with the patient's routine recovery. ROA.15. No claims were advanced or even threatened by the patient or her family. ROA.15. Rubenstein later confirmed that Doe adhered to the standard of care in removing the diseased tube. ROA.15. The surgeon-in-chief of NYU Hospitals likewise concurred. ROA.16. And a senior surgeon from the New York Department of Health's Office of Professional Medical Conduct (OPMC) conveyed that he could not second guess Doe's decision. ROA.16. OPMC ultimately took no action against Doe or his license to practice medicine. ROA.16.

Nonetheless, on the morning of October 5, 2009, PBMC's Chief Medical Officer, Dr. Richard Kubiak, told Doe he was fired with no discussion of the complication or the successful outcome of the surgery. ROA.17. Unbeknownst to Doe, Kubiak then attended an October 5 meeting at PBMC that documented the start of an "investigation" of the case. ROA.20-22. Later that same afternoon, Kubiak met with Rubenstein. ROA.22. After that meeting, Kubiak summoned Doe to his office

8

and backtracked. He told Doe that he in fact had never been fired, that Kubiak had lacked authority to fire him, and that only the hospital CEO had that authority. ROA.23. Kubiak also conveyed to Doe that, having spoken with Rubenstein, Kubiak now understood that the laparoscopic appendectomy case was "just a complicated case with no malpractice," and that "it would be very unfair for the hospital to take any action against [Doe]." ROA.23.

All this occurred against the backdrop of Doe having been contacted by the administrative director of the American Board of Thoracic Surgery (ABTS) in mid-September 2009. ROA.13. The administrative director told him that it was likely that the ABTS would require him to return to the residency program at the University of Tennessee to complete an additional year of senior-level cardiac surgery training to qualify for the next board exam, since they believed he needed more senior-level cases. ROA.13. She told Doe that the ABTS Credentials Committee would make its final decision as to whether he would have to return to Tennessee on October 3, 2009. ROA.13.

With this prospect in mind, at their October 5 afternoon meeting, Doe told Kubiak that he almost certainly was going to need to resign from PBMC at the end of the month to complete a required fellowship starting in November 2009, and that he would be leaving the Hospital to return to Tennessee in a week or two. ROA.23.

Doe then told Kubiak that there was an issue that he needed to be "absolutely clear on" before resigning. ROA.23. Because employers, insurers, and state agencies routinely ask whether the applicant has "ever resigned while under or to avoid investigation," ROA.23-24, Doe told Kubiak that he needed to know if he was under investigation; under no circumstance could he resign in such a situation. ROA.24.

Doe therefore asked Kubiak if he was under investigation. ROA.24. Kubiak told Doe he was not. ROA.24. Doe asked Kubiak if there was going to be an investigation. ROA.24. Kubiak said no. ROA.24. If Doe had been told that he was under investigation, he would have stayed on staff to defend his clinical practice in the surgical case. ROA.24. Kubiak acknowledged that he understood Doe's point. ROA.24.

*After* Kubiak told Doe that he was not, and would not be, under investigation, Doe then said to Kubiak that since he was almost certainly going to be leaving PBMC, he did not want to handle more cases, be "on call," or see new patients, since he would not be available to provide post-operative care. ROA.24. Doe indicated to Kubiak that he planned to remain at PBMC until the end of the following week, and that he intended to formally resign from PBMC at the end of the month. ROA.25.

Kubiak then said to Doe, "Would you like to put it in writing?" ROA.25. Doe agreed, believing it would be useful to ensure that other doctors would not call him

with the expectation of seeing new patients. ROA.25. Kubiak then typed up a letter and handed it to Doe.

The letter said:

> I will not operate at Peconic Bay Medical Center for the next two weeks effective October 5, 2009 through October 19, 2009, or until mutually agreed upon. I will however, finish the follow-up care on patients that I am currently involved with on the clinical floors without performing any surgery.

ROA.25. The letter did not disclose any investigation or commit Doe to not exercising his clinical privileges. ROA.25.

Doe was unaware that Kubiak was deceiving him into signing a letter that would later be mischaracterized by the PBMC as his surrendering his surgical privileges "while under an investigation" and that he "voluntarily agreed to refrain from practicing surgery pending the Hospital's investigation." ROA.26. Nor, for that matter, did it occur to Doe that Kubiak knew that Doe was under investigation and lied to him about it.

That same day, the Hospital erroneously reported to the New York State Department of Health and to the Joint Commission on Accreditation of Healthcare Organizations (JCAHO) that Doe had been suspended pending completion of the investigation. ROA.26-27. Doe was never notified that he had been suspended, and he did not learn of these erroneous reports until the administrative review process well over a year later. ROA.27.

Two days later, on October 7, 2009, prior to Doe submitting a resignation letter so he could undertake the fellowship, Kubiak again assured Doe that he was not under investigation. ROA.29-30. In reliance on these repeated assurances from PBMC's Chief Medical Officer, Doe then submitted his resignation on October 7 with an effective date of October 16. ROA.31-32.

PBMC deceived Doe. Without notice, PBMC administrators conducted a private review meeting on October 14 to discuss the case with Kubiak and Doe's direct economic competitor, PBMC surgeon Dr. George Keckeisen. ROA.33-34, 37. Documents later submitted to HHS reflected that a gynecological oncologist, Dr. Hannah Ortiz, was present. ROA.43-45. But Ortiz later provided deposition testimony she did not attend that meeting and was not involved in the review. ROA.43-45.

On December 3, 2009, again without notice to Doe, the Hospital filed an AAR in the Data Bank that reported Doe's "inadvertent" removal of the patient's Fallopian tube and stated that the Hospital had conducted a "quality assurance review" to determine whether Doe departed from the standard of care. ROA.52-54. The report was classified as Doe's "voluntary surrender" of clinical privileges "while under, or to avoid," investigation. ROA.53.

In anticipation of the end of his successful cardiac fellowship, Doe was offered an interview for a position at Reston Hospital Center in Virginia. ROA.55-

56. Doe first learned of this NPDB Report on June 1, 2010, over six months after PBMC filed it on December 3, 2009, when a well-regarded hospital queried the Data Bank's records in anticipation of hiring Doe, and then cancelled the previously scheduled interview with him, specifically citing the AAR as the reason for the cancellation. ROA.56.

At that point, Doe requested PBMC retract the report for inaccuracies, but the Hospital refused, despite Kubiak's repeated multiple assurances that Doe was not under investigation. ROA.151.

## B.     The Secretary's cursory review of the AAR

In August 2010, Doe requested administrative review by HHS ("Secretarial Review") of the AAR. ROA.57. The agency did not hold a hearing or require sworn statements. Instead, it accepted PBMC counsel's unsworn submissions of letters and hospital documents. ROA.60-61, 63. In those documents, PBMC falsely claimed that its investigation was a precursor to a professional review action and was initiated to determine what action to take against Doe's clinical privileges; that PBMC placed Doe on suspension on October 5, 2009; and that PBMC correctly reported the purported "suspension" to the New York State Department of Health. *See* ROA.65-103.

The Secretary did not provide Doe with a hearing to challenge or respond to PBMC's documents. Instead, the Secretary relied on the false statements in PBMC's

documents to decide its review against Doe and, by letter dated June 25, 2012, refused to void the AAR. ROA.108-09. The decision expressly relied on and repeatedly cited the Hospital's non-existent "suspension" as evidence that Doe had been under investigation and must have known it. ROA.108-09. It also highlighted the Hospital's false representations that its investigation targeted Doe's clinical privileges. ROA.108. The Secretary refused to consider whether Doe knew of the investigation or whether Doe was misinformed about the investigation. ROA.109. The false AAR, still on the Data Bank to this day, has broadly precluded Doe from employment as a surgeon. ROA.130-32.

## III.  Procedural History

### A.   Doe's New York state-court action against the Hospital

Doe sued PBMC and some of its officers and employees in New York state court in March 2012 for common law claims of fraud, negligent representation, promissory estoppel, breach of contract, and tortious interference with prospective economic advantage. ROA.108. Between December 2016 and August 2023, the New York litigation produced a vast amount of documentary and testimonial evidence showing that during the Secretarial Review, PBMC's counsel submitted a file replete with falsehoods to the agency, especially regarding the events in the immediate aftermath of the October surgery. ROA.114-16. The New York state court granted summary judgment to the defendants, ROA.119, which was affirmed

on appeal, ROA.126-27. The appellate court issued a limited decision reasoning that Doe had not established the existence of a job offer that would have been extended to him but for the Hospital's conduct. ROA.127. And in reliance of the Hospital's representations to the court, the panel also found that there was no evidence that a "corrective action" was contemplated prior to Doe's resignation, which defeated Doe's breach-of-contract claim. ROA.127.

## B.    Doe's District of Columbia action against the Secretary

Doe also filed an action in July 2012 in the United States District Court for the District of Columbia against the Secretary, the Data Bank, and three Data Bank officials. *See Doe v. Rogers*, 139 F. Supp. 3d 120 (D.D.C. 2015) (*Doe I*). The thrust of Doe's complaint was that the Secretary "unlawfully accepted, maintained, and continue to release an inaccurate, fraudulent, and untimely [Report] that was submitted to the [Data Bank] by Dr. Doe's prior employer, [the Hospital]." ROA.284 (quoting *Doe I*, 139 F. Supp. 3d at 126) (alterations in original). All claims, save one sub-claim, were dismissed. *Doe I*, 139 F. Supp. 3d at 170. The issue that remained was whether the AAR's statement that "the hospital's quality assurance review of this matter indicates departures by the physician from standard of care" was reportable. *Id.* On June 17, 2015, the court remanded that issue to the Secretary for review and stayed the case. *Id.*

On remand, HHS decided that the sentence should be maintained in the report. ROA.113. Thereafter, the district court upheld the Secretary's determination and denied three motions to supplement the administrative record and one motion to re-argue based on new evidence. *See Doe v. Rogers*, 656 F. Supp. 3d 78, 97 (D.D.C. 2023) (*Doe II*).

Doe subsequently filed a *pro se* appeal. *See Doe v. Rogers*, No. 20-5297, 2023 WL 1978697, at *1 (D.C. Cir. Feb. 14, 2023). In February 2023, in a one-sentence opinion, that court affirmed "substantially for the reasons stated by the district court in its memorandum opinions," *id.*, and the Supreme Court denied Doe's petition for a writ of *certiorari*, *Doe v. Rodgers*, 144 S. Ct. 328 (Mem.) (2023).

## C.    Doe's request to the Secretary for reconsideration

After the Supreme Court denied *certiorari*, Doe submitted a request for reconsideration to the Secretary in the light of new evidence of the Hospital's fraud obtained in the state-court case between December 2016 and September 2023. ROA.127-28. Doe included 7,680 pages of material—mostly derived from discovery in the New York state-court case, and none of which was available for the first agency proceeding—which showed PBMC's fraudulent conduct against Doe and in the prior administrative proceeding. ROA.128-29. The Secretary denied his request in January 2024, informing him that "[a]fter review of the information available, as well as your request, it has been determined that you are not eligible for

additional administrative review of the Report." ROA.129. The letter concluded that by telling him that "[y]ou have exhausted the administrative remedies available to you with the United States Department of Health and Human Services." ROA.129.

### D. The Eastern District of Texas action against the Secretary

On February 12, 2024, Doe filed this action in the Eastern District of Texas against the Health and Human Services Department.[3] He asserted four causes of action: *first*, that the Act facially violates the Fifth Amendment's Due Process Clause. ROA.132-39. *Second*, the Act facially violates the Legislative Vesting Clause. ROA.139-44. *Third*, the denial of reconsideration violated his due process rights. ROA.144-81. And *fourth*, the Secretary violated the APA when he denied Doe's request for reconsideration. ROA.181-83. The Secretary moved to dismiss the entire case on res judicata grounds. ROA.186-99.

The motion to dismiss was referred to a magistrate judge. In her report and recommendation, the magistrate judge concluded that res judicata barred the first three causes of action and that no exception to that doctrine recognized in the Fifth Circuit applied. ROA.300-11. With respect to Doe's fourth claim, the magistrate judge disagreed with the Secretary that res judicata applied. ROA.312-15. Instead, the magistrate judge concluded that the denial of reconsideration was unreviewable,

---

[3] Because the relevant actor is the Secretary for purposes of Doe's reconsideration request, *supra* pp. 6-7, this brief refers to the Secretary as the defendant and appellee.

and that Doe had not introduced "new evidence" that was unavailable to him during the District of Columbia litigation. ROA.312-15.

Upon review of Doe's objections, the district court determined that the report and recommendation did not fail to accept the complaint's factual allegations as true, ROA.424-25; that it did not misinterpret or misapply relevant caselaw, ROA.426-28, 430-32; and that Doe's objections to the report's new-evidence finding were meritless, ROA.418-30. The court adopted the report in its entirety and dismissed Doe's claims. ROA.434.

## SUMMARY OF THE ARGUMENT

**I.**     The district court erred in dismissing Doe's APA claim. Doe identified a viable legal theory under *BLE* and supported that theory with well-pleaded facts. He asked the Secretary to reopen the agency's initial decision not to void the AAR based on new evidence that he uncovered in the years after the initial Secretarial Review. Doe carefully explained what that new evidence was and how it would have, or at least should have, resulted in a different outcome on reconsideration. This was more than sufficient showing to survive a motion to dismiss.

**II.**     For similar reasons, the district court's dismissal of Doe's as-applied due process claim should also be reversed. This claim does not implicate the same nucleus of operative facts as the claims that he asserted in the District of Columbia lawsuit and is thus not barred by res judicata. In that lawsuit, Doe sought judicial

review of the Secretary's June 25, 2012 administrative decision. Properly construed, Doe's as-applied due process claim in this case focused on the Secretary's refusal to conduct a new administrative review based on a record that included substantial evidence of malfeasance obtained from the New York litigation between 2016 and 2023. Doe contends that the Secretary's refusal to do so violated basic due process principles. This claim could not have been raised in the first round of litigation. It only arose in 2023, well after the district court in the District of Columbia dismissed his claims and his appeals had been exhausted. This suit is the first instance that Doe sought to challenge the Secretary's refusal to reopen on due process grounds. Res judicata poses no obstacle to his pursuit of that claim.

## STANDARD OF REVIEW

"A district court's grant of a motion to dismiss is reviewed de novo." *Budhathoki v. Nielsen*, 898 F.3d 504, 507 (5th Cir. 2018). Likewise, the "res judicata effect of a prior judgment is a question of law that this court reviews de novo." *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 571 (5th Cir. 2005).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must provide "a short and plain statement of the claim showing that the pleader is entitled to relief . . . in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Wampler v. Sw. Bell Tel. Co.*, 597 F.3d 741, 744 (5th Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 550 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all of the complaint's allegations are true." *Id.* Ultimately, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Id.*

## ARGUMENT

### I.    The District Court Improperly Dismissed Doe's APA claim.

The Secretary moved for dismissal of Count Four—Doe's APA claim—solely on res judicata grounds. *See, e.g.*, ROA.248 ("[A]ll of the claims Doe asserts in this litigation are barred by res judicata because they have already been adjudicated by the U.S. District Court for the District of Columbia, and reviewed by the U.S. Court of Appeals for the District of Columbia"). The magistrate judge rightly recognized that this assertion was "clearly wrong" because "no court of competent jurisdiction has entertained, let alone entered a final judgment on the merits, on whether HHS's denial of Dr. Doe's reconsideration request comported with the APA." ROA.312.

The report and recommendation nonetheless addressed a different question that the Secretary did not raise: whether an agency's denial of a petition for reconsideration is unreviewable. ROA.312 (citing *BLE*, 482 U.S. at 278-82); *see also Vill. of Barrington v. Surface Transp. Bd.*, 758 F.3d 326, 328-29 (D.C. Cir. 2014) (holding that this inquiry is jurisdictional).

Under the APA, a person "suffering a legal wrong because of agency action . . . is entitled to judicial review." 5 U.S.C. § 702. Courts must set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see* ROA.312, (noting that an "agency's denial of a request for reconsideration is typically 'final agency action,'" citing *Indep. Turtle Farmers of La., Inc. v. United States*, 703 F. Supp. 2d 604, 610 (W.D. La. 2010), but declining to provide "further consideration of this issue").

As a general matter, "when an agency merely affirms its original decision in denying a petition for reconsideration, it has not rendered a judicially reviewable decision" under the APA. *Palacios v. Spencer*, 906 F.3d 124, 127 (D.C. Cir. 2018). But this rule contains an important exception for allegations of "new evidence" or "changed circumstances." *BLE*, 482 U.S. at 278; *accord Vill. of Barrington*, 758 F.3d at 328-29.

Doe premised his request for agency reconsideration "on the basis of new evidence," ROA.183, which he acquired during the pendency of the New York litigation between December 7, 2016, and August 31, 2023. ROA.216. Two examples (which Doe highlighted in his objections to the report and recommendation) suffice:

- In the New York State litigation, the Hospital took the position that its investigation did not contemplate corrective action against Doe's clinical

privileges. ROA.394; *accord* ROA.127 (representations in New York courts). Because an "investigation should be the precursor to a professional review action," 2001 NPDB GUIDEBOOK, *supra*, at E-19; 42 U.S.C. § 11151(9) (defining "professional review action" as an action "which affects . . . adversely the clinical privileges . . . of the physician"), the Hospital had no basis under the Act to report Doe's resignation, ROA.394.

- The Hospital previously claimed that it suspended Doe. ROA.394. During the New York litigation, hospital administrators admitted that: the Hospital never suspended Doe's clinical privileges; the Hospital's reports stating otherwise were erroneous; the Hospital administrators knew in 2009 that the Hospital's reports stating the Hospital suspended Doe's clinical privileges were erroneous; and the Hospital administrators never corrected the error in their reports that the Hospital had suspended Doe's clinical privileges. ROA.42, 62-63, 394. This was a remarkable turnabout from what the Hospital conveyed to the Secretary during the initial review. ROA.65-103.

Doe also identified other instances of the Hospital's fraudulent submissions during the first Secretarial Review that civil discovery in the New York lawsuit uncovered. For example, the Hospital listed a gynecological oncologist as having been present at the Hospital's "root cause analysis" meeting to review the case. ROA.43-45. But the Hospital's only gynecologic oncologist testified that she did not

know about, let alone attend, that meeting, and did not contribute to the root cause analysis or to the hospital's "investigation." ROA.43-45. In fact, only Kubiak and Keckeisen were present for that meeting, ROA.45, despite statutory direction that an economic competitor of a subject doctor, like Keckeisen, should not participate in an investigation, ROA.45; 42 U.S.C. § 1112(b)(3)(A).

The report and recommendation saw all this as a mere "incantation[] of 'new evidence'" and deemed it insufficient to invoke *BLE*. ROA.314. It looked behind Doe's pleadings and found that Doe's reconsideration request was not "actually based on new evidence," ROA.314, because Doe was purportedly "in possession of all the evidence and could have had HHS review it before the D.C. district court ruled on his motion for re-argument and entered final judgment in that case," ROA.315. The district court agreed. ROA.426.

The district court's focus on what transpired in the earlier litigation misconstrued *BLE*, which did not involve multiple federal lawsuits. 482 U.S. at 278-79. The report and recommendation's own cited authority accurately states that "new evidence means facts which, through no fault of the petitioner, the *original proceeding* did not contain." ROA.314 (citing *Smalls v. Spencer*, No. CV 17-606 (TJK), 2021 WL 289382, at *4 (D.D.C. Jan. 28, 2021) (emphasis added)); *see also Sendra Corp. v. Magaw*, 111 F.3d 162, 166 (D.C. Cir. 1997) (noting that the information supplied by the petitioner was available before the agency first acted).

This distinction flows directly from *BLE*. The issue there was whether courts can consider a petition to reopen "based upon no more than 'material error' in the original *agency* decision." 482 U.S. at 278-79 (emphasis added). The Court answered "no" to that question because "where no new data but only 'material error' has been put forward as the basis for reopening, an appeal places before the courts precisely the same substance that could have been brought there by appeal from the original order." *Id.* at 279. By contrast, the Court made clear that if "review of denial to reopen for new evidence or changed circumstances is unavailable, the petitioner will have been deprived of all opportunity for judicial consideration—even on a 'clearest abuse of discretion' basis—of facts which, through no fault of his own, the original proceeding did not contain." *Id.* In context, the Court's latter reference to an "original proceeding" could not mean anything other than the original proceedings before the agency itself.

The Secretary has long understood this distinction. In fact, in the letter rejecting Doe's initial request to void the AAR, the Secretary told him that if he should wish to seek reconsideration, he should "be specific about any new information that was unavailable to you at the time *of the review*." ROA.398 (emphasis added). Counsel for the Secretary later told Doe during the District of Columbia litigation that he could present additional information "to the Agency *at any time*." ROA.346 (emphasis added). In the district court proceedings here, the

Secretary offered no basis, nor did the court identify one, that the Secretary should be free to renege on his promises. "[P]articularly when so much is at stake, … the Government should turn square corners in dealing with the people." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 24 (2020) (citation omitted).

Just like the agency, courts have long understood *BLE*'s application. For example, in *Village of Barrington*, a small town petitioned for review of the Surface Transportation Board's denial of its request to reopen a 2008 proceeding in which the Board had approved a railroad's acquisition of a railway company. 758 F.3d at 327-28. The town sought to introduce evidence of a 2011 study that could have affected the Board's decision. *Id.* at 328. The D.C. Circuit agreed that this claim could proceed under *BLE*. *Id.* at 328-29. As the court noted, "there is no dispute that observations of 2011 train traffic could not have been put before the Board in 2008." *Id.* at 329. The court explained that "[w]hether this new evidence (and this new evidence only) was enough to warrant a change in the Board's original decision is a merits question; it is not a question of jurisdiction." *Id.*

The district court reversibly erred by deviating from that analysis. Once it was compelled to do so in discovery, the Hospital turned over damning information that Doe had no access to when he challenged the AAR in 2010. But according to the Eastern District of Texas, Doe should have submitted the evidence that he gathered from the New York litigation to the Secretary before the conclusion of the District

of Columbia litigation. ROA.314. Nothing in *BLE*, however, required that of him. The same is true of the Secretary's own directions when it denied his initial request for review. ROA.398. The only question that matters is whether, "through no fault of his own, the original proceeding did not contain" the evidence he acquired from the New York case. *BLE*, 482 U.S. at 279. On that score, the district court did not even suggest, let alone hold, that Doe should have litigated and concluded his claims against the Hospital in New York state court *before* the denial of his original request for Secretarial Review. Given the scope of his claims against the Hospital and the typical pace of civil litigation, that expectation would have been nearly impossible to meet.

Relatedly, in discarding Doe's allegations of new evidence, the district court departed from the cardinal rule that a court must accept a plaintiff's well-pleaded allegations as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). After all, the district court's review "generally should focus exclusively on what appears in the complaint and its proper attachments … focus[ing] on the entirety of the complaint, regardless of how much of it is discussed in the motion to dismiss." *Wilson v. Birnberg*, 667 F.3d 591, 595 (5th Cir. 2012). The district court failed to do so here, *supra* pp. 21-23, because it relied in large measure on pleadings and judicial decisions in the District of Columbia and New York. Those documents were irrelevant for purposes of resolving whether Doe's new evidence was unavailable to

him during the Secretary's initial review. As to that question, all the court had to do was look at the facts that Doe pleaded to support his assertion. The district court committed reversible error by ignoring them.

## II. The District Court Improperly Dismissed Doe's As-Applied Due Process Claim.

In Count Three of his Complaint, Doe raised an as-applied procedural due process claim targeted at the Secretary's failure to reconsider his initial decision. ROA.145. Even without the liberal construction that pro se pleadings are afforded as a matter of course, *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007), under any fair reading of his complaint, Doe asserted: (1) that he was deprived of a protected property interest—the "destr[uction] of Dr. Doe's career as a physician and surgeon in the United States" due to "the false and fraudulent Adverse Action Report, knowingly maintained by HHS"—and (2) that this deprivation was without due process. ROA.145; *see Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982) (procedural due process claims require a "familiar two-part inquiry" of courts to determine "whether [plaintiff] was deprived of a protected interest, and if so, what process was [plaintiff] due.").

Doe then specifically contended that "the agency's decision not to void the Adverse Action Report on the basis of the new evidence submitted to it . . . and to continue to maintain and publish the Adverse Action Report, is arbitrary, capricious, an abuse of discretion, contrary to law, and *contrary to constitutional right*."

ROA.183 (emphasis added); *accord* ROA.181 ("[A] decision by the agency not to review new evidence and judicial estoppel and not to void the Adverse Action Report is a denial of Dr. Doe's constitutional right to due process."); ROA.223 ("The Complaint pleads that this improper agency decision not to review the new facts . . . has the effect of deprivation of Dr. Doe's Fifth Amendment right to due process . . . the Adverse Action Report has broadly precluded Dr. Doe from the practice of medicine in the United States.").

The Secretary ignored these allegations. In his motion to dismiss, the Secretary asserted that Doe's third cause of action solely consisted of an as-applied Fifth Amendment challenge to the Act itself. ROA.196. It was only based on that mischaracterization that the Secretary urged the court to find that Doe's procedural due process claim was barred by res judicata. *E.g.*, ROA.309 ("As explained above, Dr. Doe's Fifth Amendment claims in this action are barred by res judicata based on any new evidence of fraud obtained after the filing of the initial complaint."); ROA.316 ("Dr. John Doe's . . . as-applied Fifth Amendment challenges . . . are barred by *res judicata* … [h]e litigated these claims against Defendant HHS in the U.S. District Court for the District of Columbia."); ROA.428 ("Insofar as Dr. Doe argues that res judicata does not bar relitigation of his three Fifth Amendment Due Process claims . . . he is mistaken for the reasons provided in the report").

The magistrate judge and the district court then tracked the Secretary's discussion of Count Three. The magistrate judge found that Doe's as-applied Fifth Amendment challenge was barred because it was litigated in the first federal action, ROA.300, and, over Doe's objections, the district court likewise concluded that res judicata barred relitigation of Doe's due process claims, adopting the report's analysis, ROA.428.

Had the district court evaluated whether Doe's properly pleaded as-applied procedural due process claim is barred by res judicata, it would have rejected the Secretary's argument. Res judicata "bars the litigation of claims that either have been litigated or should have been raised in an earlier suit." *Hous. Pro. Towing Ass'n v. City of Houston*, 812 F.3d 443, 447 (5th Cir. 2016). A defendant must establish four elements for this defense: (1) the parties in the current action are the same or in privity with the parties in the prior action; (2) the court that rendered the prior judgment was a court of competent jurisdiction; (3) the prior action terminated with a final judgment on the merits; and (4) the same claim or cause of action is involved in both suits. *Sacks v. Tex. S. Univ.*, 83 F.4th 340, 344 (5th Cir. 2023). Both parties agreed that the inquiry here turns on the fourth and final inquiry.

This Court employs a "transactional test to determine whether two claims involve the same cause of action, under which the critical question is 'not the relief requested or the theory asserted but whether the plaintiff bases the two actions on

the same nucleus of operative facts.'" *N.Y. Life Ins. Co. v. Gillispie*, 203 F.3d 384, 387 (5th Cir. 2000) (quoting *Agrilectric Power Partners v. General Elec. Co.*, 20 F.3d 663, 665 (5th Cir.1994)). "Subsequent wrongs by a defendant constitute new causes of action not barred by res judicata when those wrongs occurred either after the plaintiffs had filed their prior lawsuit or after the district court had entered judgment in the prior lawsuit." *Sacks*, 83 F.4th at 345 (cleaned up). "Simply, *res judicata* does not extinguish claims which did not even then exist and which could not possibly have been sued upon in the previous case." *Id.* (cleaned up).

The Secretary described Count Three as arising from the "same nucleus of operative facts as the prior litigation." ROA.187. This was plainly wrong. The Supreme Court denied Doe's petition for a writ of *certiorari* on October 16, 2023. 144 S. Ct. at 328. Doe did not even submit his request for reconsideration until December 18, 2023, and the request was not rejected until January 30, 2024. ROA.129, 182. A claim that did not arise before the conclusion of the prior action is not barred by res judicata. *See Singh*, 428 F.3d at 572; *e.g.*, *Morgan v. Covington Twp.*, 648 F.3d 172, 178 (3rd Cir. 2011) ("[R]es judicata does not bar claims that are predicated on events that postdate the filing of the initial complaint").

The report and recommendation rejected the Secretary's res judicata argument as to Doe's APA claim because "no court of competent jurisdiction has entertained, let alone entered a final judgment on the merits, on whether HHS's denial of

30

Dr. Doe's reconsideration request comported with the APA." ROA.312. The same, of course, is true of Doe's as-applied due process claim: no court has considered whether the Secretary's denial of reconsideration violated the Fifth Amendment. This claim, like Doe's APA claim, should now return to the district court to allow for that review.

## CONCLUSION

The district court's judgment should be reversed.

Dated: March 12, 2025.      Respectfully submitted.

*/s/ Judd E. Stone II*
Judd E. Stone II
Michael R. Abrams
Caroline A. Merideth
Cody C. Coll
**STONE HILTON PLLC**
600 Congress Ave., Ste. 2350
Austin, TX 78701
Telephone: (737) 465-3897
judd@stonehilton.com
michael@stonehilton.com
caroline@stonehilton.com
cody@stonehilton.com

## CERTIFICATE OF SERVICE

On March 12, 2025, this document was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court.

*/s/ Judd E. Stone II*
Judd E. Stone II

## CERTIFICATE OF COMPLIANCE

This document complies with Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 7,168 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f). This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced, serifed typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Judd E. Stone II*
Judd E. Stone II